<u>FOR PUBLICATION</u>

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MICHAEL JACOBS,**<br>                    **Plaintiff,**<br><br>          **v.**<br><br>**SHARON HALPER; BARRY HALPER,**<br>**INC.; SOTHEBY'S, INC.; SOTHEBY**<br>**PARKE BERNET, INC.; SOTHEBY**<br>**HOLDINGS; SOTHEBY'S; GREY**<br>**FLANNEL AUCTIONS, INC.; GREY**<br>**FLANNEL COLLECTIBLES, INC.,**<br>                    **Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO.  14-6515** |

**<u>OPINION</u>**

**I.      INTRODUCTION**

This dispute concerns Plaintiff Michael Jacob's purchase in December 1999 at a

Sotheby's auction of a 1951 Willie Mays New York Giants signed rookie road jersey (the "Mays

Jersey") and a 1950's Willie Mays New York Giants travel bag (the "Mays Travel Bag")

(together, the "Mays memorabilia"), which he subsequently learned were inauthentic.  Plaintiff

alleges that the Defendants knew the items had not been authenticated at the time he bought them

despite making written representations in the auction catalogue that they had.  Plaintiff brings

this lawsuit against three separate groups of Defendants: (1) Sharon Halper and Barry Halper,

Inc. (collectively, "Halper"), who were alleged to be engaged in the business of buying and

selling sports memorabilia, and who were the previous owner(s) of the Mays Jersey and Mays

Travel Bag; (2) Sotheby's, Inc., Sotheby Parke Bernet, Inc., Sotheby Holdings, and Sotheby's

(collectively, "Sotheby's"), all of which allegedly served as the auction house for the sale of the

Mays Jersey and Mays Travel Bag; and, (3) Grey Flannel Auctions, Inc. ("GF Auctions") and

Grey Flannel Collectibles, Inc. ("GF Collectibles") (collectively, "Grey Flannel"), which allegedly specialize in authenticating, appraising, and auctioning sports memorabilia, and who were represented by Sotheby's to have authenticated the Mays Jersey prior to the Sotheby's auction.

Each of Defendants has filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Grey Flannel Defendants have also moved the Court for dismissal pursuant to Rule 12(b)(2) for lack of personal jurisdiction.  The Court held oral argument on the motions.

## II.      BACKGROUND

### A.      *Sotheby's Advertises the Halper Collection*

In or about early 1999, Sotheby's advertised an auction sale of Barry Halper's collection of baseball memorabilia, which was described as "the world's largest and most significant private collection on baseball."  Am. Compl. ¶ 23.  With the help of Grey Flannel, Sotheby's and Halper published a three-part auction catalogue entitled "The Barry Halper Collection of Baseball Memorabilia" (the "Halper Catalogue").  *Id.* ¶ 22.  The Halper Catalogue stated that the auction would "establish new standards for the hobby in the areas of condition, authenticity, provenance, and historical significance."  *Id.* ¶ 24.  Further, the Halper Catalogue represented that Grey Flannel had authenticated all the uniforms and jerseys in the auction.  *Id.* ¶ 25. Specifically, page 37 of the Halper Catalogue states, "Grey Flannel has authenticated all uniforms and apparel (excluding most baseball hats)."  *Id.*, Ex. A.

### B.      *Plaintiff's Purchase of the Mays Jersey and Travel Bag*

Plaintiff obtained a copy of the Halper Catalogue in or about the summer of 1999.  *Id.* ¶ 26.  The catalogue described the Mays Jersey as "one of the most important pieces of memorabilia relating to [Willie Mays'] glorious career."  *Id.*, Ex. B.  On around September 29,

2

1999, Plaintiff bid by telephone on the Mays Travel Bag and the Mays Jersey.  *Id.* ¶ 28.

Plaintiff was the successful bidder on both items and paid $8,625.00 for the bag and $63,000 for

the jersey, *id.* ¶ 30, by wiring the money plus the applicable sales tax to Sotheby's.  *Id.* ¶ 31.

The Halper Catalogue included a copy of Sotheby's Conditions of Sale and Terms of

Guarantee ("Conditions & Guarantee").  Sotheby's Opp'n, Ex. B.[1]  The Terms of Guarantee set

forth the following provisions:

> **Authenticity.** . . . If within five years from the date of sale of a purchased lot, the original purchaser of record tenders to us a purchased lot in the same condition as when sold and it is established that the catalogue description of the lot as it relates to its authenticity (as defined above . . . ) is not substantially correct based upon a fair reading of the catalogue as a whole, . . . the sale of such lot will be rescinded and the original purchase price refunded.

> **Sole Remedy.**  It is further specifically understood that the remedy set forth herein, namely the rescission of the sale and refund of the original purchase price paid for the lot, is exclusive and in lieu of any other remedy which might otherwise be available as a matter of law.

*Id.*  In addition, the Conditions of Sale included a New York state choice of law clause, which

provides:

> These Conditions of Sale and Terms of Guarantee, as well as the purchaser's and our respective rights and obligations hereunder, shall be governed by and construed and enforced in accordance with the laws of the State of New York.  By bidding at an auction, whether present in person or by agent, order bid, telephone or other means, the purchaser shall be deemed to have consented to the jurisdiction of the state courts of, and the federal courts sitting in, the State of New York.

*Id.*

---

[1]  In evaluating a motion to dismiss, the Court may consider a "document integral to or explicitly relied on in the complaint" without converting the motion into one for summary judgment.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotations and alterations omitted).  Here, the Court will consider pages from the Halper Catalogue that Sotheby's includes as an exhibit to its brief—the same catalogue attached in part as Exhibits A and B of the Amended Complaint and relied upon by Plaintiff.  Sotheby's June 18, 2015 Ltr. at 2-3.

C.      *Plaintiff Retains Leland Collectibles to Appraise the Value of the Mays Jersey*

In or around July 2012, Plaintiff retained Leland's Collectibles of Bohemia, New York ("Leland's") to appraise the Mays Jersey for insurance purposes.  *Id.* ¶ 33.  At that time, Leland's appraised the Mays Jersey at $400,000.  *Id.* ¶ 34.

In or around June 2013, Plaintiff entered into a written sales agreement with Leland's in which Leland's agreed to purchase the Mays Jersey from Plaintiff for $675,000, subject to the approval of the third-party to whom Leland's had agreed to sell the jersey.  *Id.* ¶ 35.  Leland's and/or its prospective buyer thereafter retained MEARS to authenticate the Mays Jersey.  *Id.* ¶ 36.  MEARS examined the Mays Jersey and concluded that it was inauthentic.  *Id.* ¶ 37.  As a result, Leland's rescinded its sales agreement with Plaintiff.  *Id.* ¶ 39.  At the same time, Leland's advised Plaintiff that the Mays Travel Bag was also inauthentic.  *Id.* ¶ 40.

D.      *Plaintiff Seeks Explanations from Sotheby's and Grey Flannel*

On September 20, 2013, Plaintiff advised Sotheby's by letter that he believed the Mays Jersey was counterfeit and intended to pursue recovery of his damages.  *Id.* ¶ 42, Ex. C.  On October 7, 2013, Sotheby's sent a response letter noting the expiration of its five (5) year Guarantee of authenticity and denying Plaintiff's claim in its entirety.  *Id.* ¶ 43, Ex. D.

On March 19, 2014, Plaintiff sent a letter to Grey Flannel advising them he had determined that the sports memorabilia he had purchased from the Halper auction was inauthentic.  *Id.* ¶ 51.  In June 2014, Plaintiff's counsel spoke with counsel for Grey Flannel by phone and requested information as to whether Grey Flannel had, in fact, authenticated the Mays Jersey.  *Id.* ¶ 54.  Grey Flannel did not respond.  *Id.* ¶¶ 55-61.

E.      *Plaintiff Obtains Documents Regarding Halper Collection*

During the course of discovery in this matter, Sotheby's produced documents showing the business relationship between Sotheby's and Grey Flannel in connection with the Halper

Catalogue.  *Id.* ¶ 63.  These documents include written terms of agreement between Sotheby's

and GF Collectibles for "cataloguing and condition reports" of up to 1,000 unspecified uniforms

from the Halper collection for a flat fee of $50,000.  *Id.* ¶ 64, Ex. M.  The contract between the

parties does not specifically provide that Grey Flannel would "authenticate" the collection.  *Id.*

¶¶ 65-66.  Similarly, the contract does not suggest that another party was hired to "authenticate"

any items.  *Id.* ¶ 67.  Nevertheless, the produced documents include a March 22, 1999, letter

from Grey Flannel to Sotheby's with proposed language for "inclu[sion] in the [Halper]

catalogue."  *Id.*, Ex. M.  Grey Flannel wrote:

> We at Grey Flannel Collectibles would sincerely like to thank Sothebys [sic], Rob
> Lifson and Barry Halper, for selecting us to *authenticate*, catalog and evaluate the
> greatest uniform collection extant.  It was well worth the many early mornings
> and late nights of work[] needed to complete this labor of love.  A Directors [sic]
> love is the play, an Artist [sic] his painting, ours is game-used Jerseys.  Our
> deepest gratitude is extended to James Gates at the Baseball Hall of Fame Library
> and Marc Okkomen[;] their help was invaluable.

*Id.* (emphasis added).

## III.   DISCUSSION

Plaintiff asserts a number of claims against each of the Defendants: misrepresentation and

fraud (Count I); negligent misrepresentation (Count II); violation of New York General Business

Law ("GBL") § 349 (Count III); Violation of Pennsylvania's Unfair Trade Practices and

Consumer Protection Law ("UTPCPL"), 72 Pa. Cons. Stat. § 201-1 *et seq.* (Count IV); and

unjust enrichment (Count V).  The Grey Flannel Defendants argue that they should be dismissed

for lack of jurisdiction.  They also argue that GF Auctions should be dismissed because it has no

relationship with Sotheby's in connection with the Halper Catalogue.  All Defendants assert a

number of arguments that would require dismissal of all, or most, of these claims, including

arguments that: (1) the statute of limitations has run on all of Plaintiff's claims; (2) the

Conditions of Sale & Terms of Guarantee in Plaintiff's contract with Sotheby's bars Plaintiff's

claims because it provides the exclusive remedy for his grievance; and (3) the economic loss doctrine bars claims for economic loss resulting from a contract.  In addition, the Defendants argue that Plaintiff has failed to state a claim with respect to each Count.  The Court addresses each argument in turn.

### A.    *Jurisdiction over Grey Flannel Defendants*

The jurisdictional issue boils down to whether a federal court in Pennsylvania has jurisdiction over New York corporations with their principal place of business in New York whose only contacts with Pennsylvania are: (1) participating in the drafting of a catalogue that, Plaintiff contends, they "should have known" would be distributed to potential customers outside New York state, including potential customers in Pennsylvania; and (2) maintaining websites that could be accessed by users in Pennsylvania.

### 1.    Participation in Drafting Halper Catalogue

In its motion to dismiss, Grey Flannel argues that the Court does not have specific jurisdiction over the Grey Flannel Defendants because Grey Flannel lacks "minimal contacts" with Pennsylvania, and the Plaintiff's alleged injury did not "aris[e] out of or relate[] to" any such contacts.  Grey Flannel Mot. at 11.  Noting that Plaintiff's Complaint bases its specific jurisdiction on the fact that Grey Flannel participated in drafting the Halper Catalogue, which was eventually sent to Plaintiff in Pennsylvania, Grey Flannel argues that it "never sent the [Halper Catalogue] to anyone in Pennsylvania," "never directed any solicitations to anyone in Pennsylvania, including Plaintiff," and indeed was "not aware that the [Halper Catalogue] would

reach Pennsylvania." *Id.* at 11-12.  Grey Flannel attached an affidavit by the President of Grey

Flannel Auctions in support of these contentions.  *See* Grey Flannel Mot., Ex. B.[2]

   During oral argument on the motions to dismiss, counsel for Plaintiff argued that GF

Collectibles' participation in drafting language for the Halper Catalogue was sufficient for this

Court to exercise specific jurisdiction over it because Grey Flannel "should have known" that the

Halper Catalogue would be "disseminated nationwide, including Pennsylvania."  Hr'g Tr. at

9:13-18, 9:23-10:1.  The Court requested supplemental briefing on the issue of personal

jurisdiction specifically directing Plaintiff to provide binding precedent that a defendant is

subject to specific jurisdiction when it "knew or should have known" that the publication it

helped prepare would be disseminated in the forum state.  However, in his letter brief, Plaintiff

rightly conceded that the case law does not support such a proposition.  Pl.'s June 18, 2015, Ltr.

at 3.  *See Kloth v. S. Christian Univ.*, 320 F. App'x 113, 116 (3d Cir. 2008) ("[A]lthough

[defendant] certainly could have foreseen that students from Delaware, or any other state, might

choose to participate in their distance learning program because the Web site is accessible to a

nationwide (indeed, global) audience, this foreseeability alone cannot satisfy the purposeful

availment requirement." (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 295

(1980))); *Marten v. Godwin,* 499 F.3d 290, 296 (3d Cir. 2007) (citing *Helicopteros Nacionales*

*de Colombia, S.A. v. Hall,* 466 U.S. 408, 414-15 & n. 8 (1984) ("Specific jurisdiction exists

when the claim arises from or relates to conduct purposely directed at the forum state.")).

---

[2] "In deciding a motion to dismiss for lack of personal jurisdiction, the Court need not treat the plaintiff's allegations as true, but may consider affidavits and weigh any other relevant evidence in making this determination." *McCann v. Sandals Resorts Int'l, Ltd.*, No. 14-2208, 2015 WL 619636, at *2 (E.D. Pa. Feb. 11, 2015).

### 2. Grey Flannel Websites

In his letter brief, Plaintiff advanced an additional argument, for the first time, that this Court has jurisdiction over the Grey Flannel Defendants "by virtue of their online sales and activity." Pl.'s June 18, 2015, Ltr. at 3. In support of this argument, Plaintiff contends that "as early as July 11, 1997," both Grey Flannel Defendants maintained "highly active websites for many years, which permitted customers both inside and outside New York to register and bid on various items for sale." *Id.* Plaintiff argues that "[s]uch operations may have included business transactions with Pennsylvania residents and marketing efforts directed at Pennsylvania residents." *Id.* Grey Flannel maintains that these allegations are insufficient to subject Grey Flannel to either general or specific jurisdiction.

**General Jurisdiction:** Plaintiff contends that Grey Flannel's websites could create a basis for general jurisdiction under *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997), and its progeny. In *Zippo*, which has become a seminal authority regarding personal jurisdiction based on website activity, the District Court considered whether a corporation's websites could subject it to jurisdiction in Pennsylvania. The Court concluded that "the propriety of exercising jurisdiction depends on where on a sliding scale of commercial interactivity a web site falls." *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 452 (3d Cir. 2003) (citing *Zippo*, 952 F. Supp. at 1124). If a defendant maintains an interactive website that allows it to "enter[] into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper." *Zippo*, 952 F. Supp. at 1124 (citations omitted). On the other hand, if the defendant maintains only a passive website that "does little more than make information available to those who are interested," there would be no grounds for personal jurisdiction. *Id.* Here, Plaintiff

contends that these cases stand for the proposition that a defendant that maintains an interactive website could be subject to general jurisdiction in any state where it has "continuous and systematic contacts." Pl.'s June 18, 2015 Ltr. at 2-3. This proposition is not supported by jurisprudence.

As an initial matter, it is important to note that in both *Zippo* and *Toys "R" Us*, the plaintiff conceded that there was no general jurisdiction, and thus the inquiry was limited to whether the defendant was subject to *specific* jurisdiction in the forum state. Moreover, several courts in this District have concluded that maintaining a website through which customers can order products does not, on its own, suffice to establish general jurisdiction. *See TruePosition, Inc. v. LM Ericsson Tel. Co.*, 844 F. Supp. 2d 571, 592 (E.D. Pa. 2012) ("To hold that the possibility of ordering products from a website establishes general jurisdiction would effectively hold that any corporation with such a website is subject to general jurisdiction in every state." (quoting *Molnlycke Health Care AB v. Dumex Med. Surgical Prods. Ltd.*, 64 F. Supp. 2d 448, 451 (E.D. Pa. 1999))); *Wilson v. RIU Hotels & Resorts*, No. 10-7144, 2011 WL 3241386, at *8 (E.D. Pa. July 29, 2011) ("Maintenance of a website which allows users to reserve accommodations at Defendant's resorts does not demonstrate that [defendant] has systematic and continuous contact with Pennsylvania"). As the Third Circuit has cautioned, "the mere operation of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world." *Toys "R" Us*, 318 F.3d at 454. Rather, for a defendant's website to constitute a sufficient presence subjecting it to general jurisdiction in Pennsylvania:

> First, the website must be highly "interactive" or allow customers the opportunity to enter directly into a contract with the defendant over the internet. [Second], much like an in-print advertising campaign, the website must be "central" to the defendant's business in the forum state or specifically target residents of the forum state."

*O'Connor v. Sandy Lane Hotel Co.*, No. 04-2436, 2005 WL 994617, at *3 (E.D. Pa. Apr. 28, 2005) (citations omitted), *modified on reconsideration*, 2005 WL 1463250 (E.D. Pa. June 20, 2005), *rev'd on other grounds*, 496 F.3d 312, 317 (3d Cir. 2007).

Here, Plaintiff contends that Grey Flannel's websites subject it to general jurisdiction here because residents of Pennsylvania were able to access those cites to register and bid on items. *See* Pl.'s Jun. 18, 2015, Ltr. Brief at 3. However, Plaintiff has not presented any evidence or argument that the websites were "highly interactive" or "engage[d] in significant commerce or otherwise intentionally target consumers in Pennsylvania through their websites." *Id.*; *see also Streamline Bus. Servs., LLC v. Vidible, Inc.*, No. 14-1433, 2014 WL 4209550, at *6 (E.D. Pa. Aug. 26, 2014). In fact, Plaintiff has not pointed to a single interaction between Grey Flannel and a Pennsylvania resident via Grey Flannel's websites. Even if he could, the Court emphasizes that the burden for establishing general jurisdiction is high. Under recent Supreme Court case law, the relevant inquiry for general jurisdiction is not whether the defendant has "continuous and systematic" contacts with the forum state, but whether its "consistent and systematic contacts" were so great as to render it "essentially at home" in that state. *Farber v. Tennant Truck Lines, Inc.*, — F. Supp. 3d —, 2015 WL 518254, at *7 (E.D. Pa. Feb. 9, 2015) (quoting *Daimler AG v. Bauman*, — U.S. —, 134 S. Ct. 746, 761 (2014) and *Goodyear Dunlop Tires Operations, S.A. v. Brown*. — U.S. —, 131 S. Ct. 2846, 2851 (2011)). As the Supreme Court explained in *Daimler*, the "at home" inquiry will, in all but the most exceptional circumstances, subject a corporation to general jurisdiction only in the two paradigmatic bases for such jurisdiction: *i.e.*, its state of incorporation and its principal place of business. 134 S. Ct. at 760-61. These "affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable." *Id.* at 760. Plaintiff has provided no facts to show

10

that the Grey Flannel Defendants have "systematic and continuous" contacts with Pennsylvania through its websites, let alone contact substantial enough for the Court to find that the Grey Flannel Defendants are "essentially at home" in Pennsylvania.  Accordingly, the Court does not have general jurisdiction over the Grey Flannel Defendants.

**Specific jurisdiction:**  Neither do the websites provide a basis for the Court to exercise specific jurisdiction over the Grey Flannel Defendants.  Under well-established Supreme Court law, specific jurisdiction is appropriate only when, *inter alia*, the claim asserted against the defendant "arises out of" its contacts with the state.  *See Daimler*, 134 S. Ct. at 754; *Helicopteros*, 466 U.S. at 414; *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009).  There is no allegation in the Complaint (or in any of Plaintiff's briefing) that Plaintiff's injury arises out of the Grey Flannel Defendants' alleged websites.  In fact, Plaintiff was not even aware that Grey Flannel operated a website until after the filing of his Complaint.  Accordingly, the Grey Flannel Defendants must be dismissed from this action for lack of jurisdiction.

      **B.**     ***Statute of Limitations***

Defendants argue that Plaintiff's Amended Complaint should be dismissed because each of the counts is time-barred by the applicable statutes of limitations.  Notwithstanding the forum selection clause in Sotheby's Conditions of Sale, Pennsylvania law applies for purposes of determining the statutes of limitations.  *See Guar. Trust Co. v. York*, 326 U.S. 99 (1945) (holding that a federal district court sitting in diversity must follow the forum's choice of law rules to determine the applicable statute of limitations period); *Gluck v. Unisys Corp.,* 960 F.2d 1168, 1179 (3d Cir. 1992) ("Choice of law provisions in contracts do not apply to statutes of limitations, unless the reference is express").

The general rule is that Pennsylvania courts ordinarily apply the Pennsylvania statute of limitations. *See Freeman v. Lawton*, 46 A.2d 205 (Pa. 1946). However, Pennsylvania's "borrowing statute" creates an exception to that rule when the cause of action accrues in another state. 42 Pa. Cons. Stat § 5521; *Mack Trucks, Inc. v. Bendix-Westinghouse Auto. Air Brake Co.*, 372 F.2d 18, 20 (3d Cir. 1966). The "borrowing statute" provides that the statute of limitations "shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, whichever *first bars* the claim." 42 Pa. Cons. Stat. § 5521(b) (emphasis added). Thus, the borrowing statute operates to bar the claim when two conditions are met: (1) the claim accrues in another state, and (2) the law of that state bars the claim before the Pennsylvania statute of limitations. *Ross v. Johns-Manville Corp.*, 766 F.2d 823, 828 (3d Cir. 1985).

The first step in determining the effect of Pennsylvania's borrowing statute on this case, therefore, requires the Court to determine whether the plaintiff's claims accrued in Pennsylvania or another state. A claim "accrues" for purposes of the Pennsylvania borrowing statute where the "final significant event that is essential to a suable claim occurs." *Mack Trucks*, 372 F.2d at 20 (citations omitted). Unlike in *Mack Trucks*, in which it was clear under both Pennsylvania and Florida law that the Plaintiff's claim accrued in Florida, it is not immediately evident where the "final significant event that is essential" to Plaintiff's various claims here occurred. On the one hand, Plaintiff's claims arguably accrued in Pennsylvania, the state in which he resided, because the alleged fraud or misrepresentation was not complete until Plaintiff acted to his detriment by purchasing the Mays Jersey and Travel Bag from his home in Pennsylvania. *See* Am. Compl. ¶ 28. On the other hand, Plaintiff's claims arguably accrued in New York, where Defendants conducted the auction, and where Plaintiff sent his money to make the purchase.

However, the Court need not wrestle with the issue for the purposes of this motion to dismiss because in his opposition brief, Plaintiff contends that the Pennsylvania borrowing statute applies (thus implicitly accepting that Plaintiff's claims accrued in New York), Opp'n to Sotheby's Mot. at 12, and Sotheby's, in its briefing, provides no argument to the contrary. Sotheby's Mot. at 9 n.2.  The Court is also persuaded by the similarities between this case and *Foley v. Juron Associates*, a securities fraud case in which a sister court concluded for purposes of determining whether or not to apply Pennsylvania's borrowing statute that the "final significant event" in securities transactions involving plaintiffs in multiple states occurred in New York, where the defendant transacted its business, not where the individual plaintiffs resided.  No. 82-0519, 1986 WL 12454, at *8 (E.D. Pa. Nov. 5, 1986).

The next question is, thus, whether the limitations period for each of Plaintiff's claims would be shorter under New York or Pennsylvania law.  In answering this question, the Court takes into account both states' limitations periods, including each state's laws on accrual and tolling.  *See Frankentek Residential Sys., LLC v. Buerger*, 15 F. Supp. 3d 574, 581 (E.D. Pa. 2014) (citing *Gwaltney v. Stone*, 564 A.3d 498, 503 (Pa. Super. Ct. 1989) ("The provisions of Pennsylvania's borrowing statute unequivocally evince the legislative intent to prevent a plaintiff who sues in Pennsylvania from obtaining greater rights than those available in the state where the cause of action arose.")).

### 1.     Limitations Periods under Pennsylvania and New York Law

Here, Plaintiff asserts causes of action for: (1) fraud and misrepresentation; (2) negligent misrepresentation; (3) violation of GBL Section 349; (4) violation of the UTPCPL; and (5) unjust enrichment.  Under Pennsylvania law, fraud and negligent misrepresentation have a two-year limitations period, *see* 42 Pa. Cons. Stat. § 5524(7); in New York, the statutory

13

limitations period for both claims is six years, *see* N.Y. C.P.L.R. § 213.  Under Pennsylvania

law, Plaintiff's claim for unjust enrichment has a four-year limitations period, *see* 42 Pa. Cons.

Stat. § 5525(a)(4); under New York law, it is six years, *see* N.Y. C.P.L.R. § 213.  The limitations

period for Plaintiff's UTPCPL claim is six years, *see* 42 Pa. Cons. Stat. § 5527; the limitations

period for a violation of New York's General Business Law Section 349 is three years, *see* N.Y.

C.P.L.R. § 214(2).  The respective limitations periods are represented in the below chart:

|  | Fraud | Negligent Misrepresentation | Unjust Enrichment | UTPCPL | GBL § 349 |
|---|---|---|---|---|---|
| Pennsylvania | 2 years | 2 years | 4 years | 6 years | N/A |
| New York | 6 years | 6 years | 6 years | N/A | 3 years |

## 2.    Accrual

Under both Pennsylvania and New York law, the statute of limitations begins to run on

the date that "the cause of action accrued."  42 Pa. Cons. Stat. § 5502(a); N.Y. C.P.L.R. § 203(a).

In Pennsylvania, a cause of action accrues when "the plaintiff could have first maintained the

action to a successful conclusion."  *Fine v. Checcio*, 870 A.2d 850, 857 (Pa. 2005) (citing *Kapil*

*v. Assoc. of Pa. State College & Univ. Faculties*, 480 A.2d 482, 485 (Pa. 1983)).  Similarly,

under New York law, "[i]n general, a cause of action accrues, triggering commencement of the

limitations period, when all of the factual circumstances necessary to establish a right of action

have occurred, so that the plaintiff would be entitled to relief."  *Gaidon v. Guardian Life Ins. Co.*

*of Am.*, 750 N.E.2d 1078, 1083 (N.Y. 2001).

Accordingly, under either Pennsylvania or New York law, Plaintiff's causes of action

accrued in 1999, when he purchased the Mays Jersey and Mays Travel Bag.  Thus, under

Pennsylvania's borrowing statute, all of Plaintiff's claims expired long before Plaintiff filed his

complaint in 2014, unless the limitations period is tolled.

14

### 3.    The Discovery Rule

In Pennsylvania, each of Plaintiff's causes of action is subject to the discovery rule.  *See Beauty Time, Inc. v. VU Skin Sys., Inc.*, 118 F.3d 140, 148 (3d Cir. 1997) (fraud); *Dilworth v. Metro. Life Ins. Co.*, 418 F.3d 345, 351 (3d Cir. 2005) (UTPCPL); *White v. PNC Fin. Servs. Grp., Inc.*, No. 11-7928, 2014 WL 4063344, at *9 (E.D. Pa. Aug. 18, 2014) (unjust enrichment); *Freedman v. Haydinger*, No. 98-3045, 2002 WL 32364522, at *3 (E.D. Pa. Oct. 28, 2002) (intentional and negligent misrepresentation).  New York's application of its discovery rule is more limited.  It allows fraud and negligent misrepresentation sounding in fraud to be tolled for two years after the Plaintiff discovers the injury, *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361 n. 3 (2d Cir. 2013) (internal quotation marks omitted) (citing N.Y. C.P.L.R. § 213(8)); however, New York's discovery rule does not apply to GBL Section 349 or unjust enrichment claims.  *See Wender v. Gilberg Agency*, 716 N.Y.S.2d 40, 41-42 (Sup. Ct. App. Div. 2000); *Cohen v. Cohen*, 773 F. Supp. 2d 373, 397 (S.D.N.Y. 2011), *aff'd in relevant part, vacated on other grounds sub nom. Cohen*, 711 F.3d 353.  Thus, the application of New York law requires dismissal of Plaintiff's Section 349 claims, which accrued in December 1999 and cannot, as a matter of New York law, be tolled.  Further, because Plaintiff's unjust enrichment claim cannot be tolled in New York, it too was brought outside the New York limitations period and is thus barred under Pennsylvania's borrowing statute.

The remaining question before the Court, therefore, is the impact of New York and Pennsylvania's discovery rule on Plaintiff's fraud claim.[3]  For the reasons set forth below, the Court concludes that Plaintiff's fraud claim is tolled under both New York and Pennsylvania law and therefore cannot be dismissed on statute of limitations grounds.  Plaintiff argues that the

---

[3]    Because the Court finds, as addressed in Section IV.C. below, that the economic loss doctrine requires dismissal of Plaintiff's negligent misrepresentation and UTPCPL claims, the Court need not address whether those claims are also barred by the statute of limitations.

statutes of limitations should be tolled pursuant to the "discovery rule" because he did not

discover his injury until 2013, when MEARS examined the Mays Jersey and informed Plaintiff

that it was inauthentic.  Opp'n to Sotheby's Mot. at 16.  Sotheby's counters that the discovery

rule does not apply because Plaintiff could have discovered his injury through the exercise of

reasonable diligence as early as 1999, when Plaintiff first purchased the Mays memorabilia.

Sotheby's Mot. at 11.  Plaintiff responds that it would be unreasonable to require him to have

obtained an independent authentication of the Mays memorabilia because Sotheby's, one of the

oldest and most venerated auction houses in the country, stated in the Halper Catalogue that Grey

Flannel had authenticated the Mays collection.  Opp'n to Sotheby's Mot. at 16.  Relying on this

representation, Plaintiff argues, he had no reason to suspect inauthenticity and therefore did not

seek to obtain an independent opinion on the authenticity of the Mays memorabilia until 2012,

when he brought the Mays Jersey to Leland's to appraise it for insurance purposes, and did not

discover that his items were inauthentic until eleven months later, when Leland's found a buyer

for the Mays Jersey and requested a third-party appraisal.  *Id*.

Looking first to New York law, the limitations period for fraud begins to run either when

the claim accrues or when the facts constituting the fraud are discovered.  *Cohen*, 711 F.3d at

361 n.3 (citing N.Y. C.P.L.R. § 213(8)).  New York courts applying similar facts to the instant

case have found that the plaintiff's claims for fraud were tolled until the discovery of the alleged

fraud.  *See, e.g.*, *Rosen v. Spanierman*, 894 F.2d 28 (2d Cir. 1990); *Fertitta v. Knoedler Gallery,

LLC*, No. 14-2259, 2015 WL 374968, at *5 (S.D.N.Y. Jan. 29, 2015); *De Sole v. Knoedler

Gallery, LLC*, 974 F. Supp. 2d 274 (S.D.N.Y. 2013).

In *Rosen*, cited by both Plaintiff and Sotheby's in their briefs, the plaintiffs brought suit

against an art gallery after learning that the painting they purchased nineteen years before was

counterfeit.  The plaintiffs sued under a variety of rubrics, including, *inter alia*, fraud and breach of warranty.  Like Sotheby's here, the defendant in *Rosen* argued the plaintiffs could have determined that their painting was inauthentic as early as the date of purchase.  Although the Second Circuit agreed that the statute of limitations barred the plaintiffs' breach of warranty claim, it held that the discovery rule tolled the plaintiffs' fraud claim, reasoning that "New York courts have exhibited a reluctance to impute discovery to a plaintiff maintaining a claim of fraud who has no reason to suspect that he has been defrauded" and that "[o]n the facts as alleged, the Rosens had no reason to suspect the authenticity of their painting until they tried to sell it." *Rosen*, 894 F.2d at 36 n.2.

In *De Sole*, a Southern District of New York court concluded that the discovery rule applied to toll a plaintiff's claims for fraud against an auction house in connection with the Plaintiff's purchase of wine.  974 F. Supp. 2d at 298-99.  Similar to the defendant in *DeSole*: (1) Sotheby's is an old and deeply respected auctioneer; (2) the Halper Catalogue specifically stated that the auctions of the items therein would "establish new standards in the areas of . . . authenticity"; and, (3) the Halper Catalogue provided written assurances concerning the authenticity of the memorabilia prior to the purchase in that it explicitly stated that "Grey Flannel has authenticated all uniforms and apparel (excluding most baseball hats.").[4]  In light of these assurances of authenticity, *DeSole* concluded that "the fact that forensic testing was available to the [plaintiffs] at the time of purchase does not trigger the running of the two-year discovery period, because the De Soles "had no reason to suspect the authenticity of their painting [at the time of purchase]." *Id.* at 298 (quoting *Rosen*, 894 F.2d at 36 n.2).  Here, too, Plaintiff had no reason to suspect the authenticity of the memorabilia at the time of purchase.  Thus, the Court

---

[4]     Sotheby's argues in its Motion to Dismiss that the Halper Catalogue specifically did not state that Grey Flannel authenticated the Mays Travel Bag.  While it is possible that the language in the Catalogue was not intended to include the Mays Travel Bag, it would be inappropriate at this juncture to so conclude.

finds that Plaintiff's fraud claim would be tolled under New York's discovery rule until June 2013, when Plaintiff discovered for the first time that the items he purchased were inauthentic.

Turning to Pennsylvania law, the Pennsylvania discovery rule "toll[s] the statute of limitations in any case where a party neither knows nor reasonably should have known of his injury and its cause at the time his right to institute suit arises." *Cole v. Ferranti*, 532 F. App'x 205, 206 (3d Cir. 2013) (quoting *Fine*, 870 A.2d at 859). Under the rule, the limitations period begins to run when the complaining party "knows, or reasonably should know, (1) that he has been injured, and (2) that his injury has been caused by another party's conduct." *Id.* (quoting *Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir. 1991)). It is reasonable to infer at the motion to dismiss stage, given Plaintiff's status as an amateur collector who had relied on an apparent guarantee of authenticity from a well-respected seller, that he could not have known or reasonably should have known that he had been injured. While theoretically Plaintiff here could have arranged for an independent authentication at the time of purchase, he had no reason to suspect the authenticity of his purchase that time.[5] In reaching this conclusion, the Court is also

---

[5]   Sotheby's arguments to the contrary are unavailing. At oral argument, counsel for Sotheby's advanced two arguments that Plaintiff was made aware of the alleged fraud prior to his interaction with MEARS. First, counsel argued that the Plaintiff was put on inquiry notice that there were potential issues with inauthenticity "from the moment he read the auction catalogue" because the warranty *itself* somehow should have alerted Plaintiff to the fact that authenticity was an issue. Hr'g Tr. at 49:25-50:2. Second, counsel argued that certain news articles that were published in cities outside Pennsylvania either should have brought the issue of potential inauthenticity to Plaintiff's attention or demonstrated that inauthenticity was a commonly known problem. The Court is unpersuaded by either argument.

Sotheby's has fundamentally misunderstood the Plaintiff's allegations. Plaintiff has not brought a claim for breach of warranty; he has brought claims for fraud. If Plaintiff had merely brought a breach of warranty claim, Sotheby's argument that the five-year guarantee should have triggered Plaintiff to take independent action to authenticate the Mays memorabilia might be persuasive. But that is not Plaintiff's claim. Plaintiff has not alleged that Sotheby's arranged the sale of the Halper collection believing it had obtained Grey Flannel's authentication services but, due to inherent risks in the authenticity of sports memorabilia, it offered a limited five-year warranty to protect customers while also limiting its own risk. Rather, Plaintiff alleges that, as early as the time Sotheby's contracted with Grey Flannel to catalogue the Halper collection, Sotheby's knew it had *not* in fact hired Grey Flannel to authenticate the items in the collection and fraudulently represented that such authentication had taken place in order to induce customers to bid on the collection: Nothing about the five-year warranty could have alerted Plaintiff to that fact.

persuaded by *Crouse v. Cyclops Industries*, in which the Pennsylvania Supreme Court cautioned that in determining the application of discovery rule "the point at which the complaining party should reasonably be aware that he has suffered an injury is a factual issue 'best determined by the collective judgment, wisdom and experience of jurors.'"  745 A.2d 606, 611 (Pa. 2000) (citations omitted).  Accordingly, the Court finds that, as in New York, the Pennsylvania discovery rule applies to toll Plaintiff's claims until June 2013, when Plaintiff was informed that the Mays Travel Bag and Mays Jersey were inauthentic.  Plaintiff's Amended Complaint was filed on April 1, 2015, well within the period he had to make his claim under either New York or Pennsylvania law.  *See* 42 Pa. Cons. Stat. § 5524(7); N.Y. C.P.L.R. § 213(8).  Because there is no conflict between New York or Pennsylvania law, Plaintiff's fraud and negligent misrepresentation claims are not barred by Pennsylvania's borrowing statute.

## C.     *Economic Loss Doctrine*

Sotheby's further moves to dismiss Plaintiff's claims on the basis of the economic loss doctrine.  New York's economic loss doctrine denies the purchaser of a defective product a tort action against sellers for purely economic losses sustained as a result of the defective product. [6]

---

For the same reasons, Sotheby's arguments concerning the news articles are irrelevant.  Even assuming Plaintiff knew or should have known that those articles were published, the articles stated only that there was some concern regarding the authenticity of the Halper collection; nothing in the articles would have put Plaintiff on notice that Sotheby's fraudulently stated that Grey Flannel had authenticated the Halper collection when it knew Grey Flannel had not done such work.

[6]   Sotheby's asserts that New York substantive law applies to Plaintiff's claims because of the choice of law provision in the Conditions of Sale governing Plaintiff's purchase of the Mays Travel Bag and Jersey.  Sotheby's Mot. at 17.  At oral argument, counsel for Plaintiff stated that he agrees New York substantive law would apply, unless the "terms and conditions provision of the contract is not relevant to the claims that are made here."  Hr'g Tr. at 4:5-13, 5:4-7.  Plaintiff similarly asserts in his response brief that "[i]t has not yet been established that the terms and conditions in the Catalogue are binding as to Plaintiff's tort-based claims."  Opp'n to Sotheby's Mot. at 28.  However, Plaintiff advances no argument as to why the Conditions of Sale provision would not apply and does not offer any additional choice-of law-analysis.  Moreover, Plaintiff's briefing includes citations only to New York law with respect to his common law tort claims.  Given the parties' reliance on New York law and absent any authority to the contrary, the Court will apply New York substantive law to evaluate Plaintiff's common law claims.

19

*Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 16 (2d Cir. 2000).  Under New York

law, the economic loss doctrine applies to claims for negligent misrepresentation, barring

Plaintiff's New York negligent misrepresentation claims here.  *See, e.g.*, *Weisblum v. Prophase*

*Labs, Inc.*, — F. Supp. 3d —, No. 14-3587, 2015 WL 738112, at *11 (S.D.N.Y. Feb. 20, 2015);

*see also Cherny v. Emigrant Bank*, 604 F.Supp.2d 605, 609 (S.D.N.Y. 2009) ("[U]nder New

York's economic loss rule, a plaintiff asserting a claim of negligent misrepresentation who has

not suffered any personal or property damage is limited to an action in contract.").  Accordingly,

Plaintiff's negligent misrepresentation claim must be dismissed.

However, New York courts have routinely permitted intentional fraud claims to proceed,

notwithstanding the economic loss doctrine.  *See Weisblum*, 2015 WL 738112, at *12; *EED*

*Holdings v. Palmer Johnson Acquisition Corp*., 387 F. Supp. 2d 265, 278 (S.D.N.Y. 2004)

(citing *Deerfield Comm. Corp. v. Chesebrough-Ponds, Inc.*, 502 N.E.2d 1003, 1004 (N.Y.

1986)); *Computech Int'l, Inc. v. Compaq Computer Corp.*, No. 02-2628, 2004 WL 1126320, at

*10 (S.D.N.Y. May 21, 2004) ("In the absence of any articulation to the contrary by the New

York courts, the economic loss doctrine will not be presumed to extend to fraud claims.").  In

light of these cases, the Court declines to dismiss Plaintiff's fraud claim on the basis of the

economic loss doctrine.  *See Weisblum*, 2015 WL 738112, at *12.

As for Plaintiff's UTPCPL claim, it is barred by the economic loss doctrine under

Pennsylvania law.  In *Werwinski v. Ford Motor Co.*, the Third Circuit predicted that the

Pennsylvania Supreme Court would find UTPCPL claims barred by the economic loss doctrine

where they are "intertwined with contract claims and the resulting loss has been economic."[7]

286 F.3d 661, 678 (3d Cir. 2002).  Here, because Plaintiff's allegedly fraudulent statements

relate to the "quality or character of the goods sold," the conduct Plaintiff alleges Defendant

engaged in is clearly "interwoven" with a breach of contract claim, and thus does not fall within

the exception.  *Id.*  Moreover, Plaintiff alleges solely economic damages.  *See id.*  Thus,

Plaintiff's UTPCPL claims shall be dismissed.

### D.    *Fraud*

Sotheby's argues that Plaintiff's fraud claim fails because he has not alleged facts

sufficient to support an inference of two elements of a fraud claim: (1) knowledge of a false

statement, and (2) intent to induce reliance.[8]  Sotheby's Mot. at 27.  *See IKB Int'l, S.A. v. Bank of*

*Am. Corp.*, 584 F. App'x 26, 27 (2d Cir. 2014) (quoting *Eurycleia Partners, LP v. Seward &*

*Kissel, LLP*, 910 N.E.2d 976 (N.Y. 2009)) (citing elements of fraud claim under New York law).

A review of the Amended Complaint through the lens of a motion to dismiss standard shows

otherwise. Plaintiff's fraud count does "contain sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

---

[7]   Recently, in *Knight v. Springfield Hyundai*, 81 A.3d 940, 952 (Pa. Super. 2013), the Pennsylvania Superior
Court held that the economic loss doctrine does not apply to UTPCPL claims.  Given this decision, several
district courts have concluded that *Werwinski* is no longer valid.  *See Kantor v. Hiko Energy, LLC*, — F. Supp.
3d —, No. 14-5585, 2015 WL 1650049 (E.D. Pa. Apr. 14, 2015).  This Court, however, concludes that
*Werwinski* remains binding law until either the Third Circuit or the Pennsylvania Supreme Court holds
otherwise.  *See Vaughan v. State Farm Fire & Cas. Co*., No. 14-1684, 2014 WL 6865896, at *4 (E.D. Pa.
Dec 3, 2014).

[8]   Sotheby's also argues that Plaintiff's claims are barred by the Conditions and Guarantee that govern Plaintiff's
transaction with Sotheby's.  Sotheby's Mot. at 16-19.  Specifically, Sotheby's cites various paragraphs that
provide a five-year warranty of authenticity for the Halper Collection and limit customers' remedy to rescission
of the contract.  While parties are free to enter into contractual clauses limiting liability to reflect the parties'
allocation of risk, *see Baidu, Inc. v. Register.com, Inc.*, 760 F. Supp. 2d 312, 317 (S.D.N.Y. 2010), New York
does not enforce agreements that purport to exonerate or limit a party's liability for willful or grossly negligent
acts.  *See, e.g.*, *Kalisch-Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 416 (N.Y. 1983) ("[A]n exculpatory
agreement, no matter how flat and unqualified its terms, will not exonerate a party from liability under all
circumstances.  Under announced public policy, it will not apply to exemption of willful or grossly negligent
acts.").  Among other things, "willful conduct" in this context includes fraud.  *Id.*  Accordingly, the Conditions
and Guarantee cannot bar Plaintiff's fraud claim here.

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In his Complaint, Plaintiff alleges that Sotheby's included language in the Halper Catalogue that it knew to be false with the intent to induce Plaintiff to bid on items in the Halper Collection.  Am. Compl. ¶¶ 73-75.  Specifically, Plaintiff alleges that Sotheby's included language stating that Grey Flannel had authenticated the jerseys in the Halper collection when it knew that it had not contracted Grey Flannel to do so.  *Id.* ¶¶ 65-70.  In support of his allegation, Plaintiff attached to his Complaint the terms of agreement between Sotheby's and Grey Flannel, which indicated that GF Collectibles would be paid $50,000 "[f]or cataloguing and condition reports on 1000 or fewer uniforms from the Halper collection."  *Id.*, Ex. M at 5.  Notably, the contract between Grey Flannel and Sotheby's did not include the word "authenticate."  Nevertheless, the Halper Catalogue, portions of which were also attached to the Complaint, included multiple alleged misstatements indicating that Grey Flannel had in fact authenticated certain items in the collection.  For example, page 37 of catalogue states that "Grey Flannel has authenticated all uniforms and apparel (excluding most baseball hats)."  *Id.*, Ex. A.  In addition, the Acknowledgements section of the catalogue which was published by Sotheby's states that "Grey Flannel Collectibles, Inc. is honored to have had the opportunity to evaluate and authenticate this wonderful collection of uniforms and jerseys belonging to Barry Halper."  *Id.*, Ex. M.  Based on these allegations, the Court finds that Plaintiff has sufficiently pleaded the elements of knowledge and intent.

IV.    **CONCLUSION**

For the reasons stated herein, the Grey Flannel Defendants' motion to dismiss is granted, and the Sotheby's and Halper Defendants' motions to dismiss are granted in part and denied in

part.  With the exception of his fraud claim, all of Plaintiff's claims are dismissed.  An order shall follow consistent with this Opinion.

Dated:  **July 22, 2015**

**BY THE COURT:**

**/s/ Wendy Beetlestone**

**WENDY BEETLESTONE, J.**