IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MICHAEL JACOBS,**<br>　　　　　**Plaintiff,**<br><br>　　　　　v.<br><br>**SHARON HALPER; BARRY HALPER; INC.; SOTHEBY'S, INC.; SOTHEBY PARKE BERNET, INC.; SOTHEBY HOLDINGS; SOTHEBY'S;,**<br>　　　　　**Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO. 14-6515** |

## **OPINION**

### I.　　INTRODUCTION

This case arises seventeen years after Plaintiff Michael Jacobs purchased a baseball jersey at a Sotheby's auction featuring baseball memorabilia offered by collector Barry Halper. Plaintiff alleges that Defendants Sotheby's, Inc., Sotheby Parke Bernet, Inc., Sotheby's Holdings, and Sotheby's (collectively, "Sotheby's") fraudulently misrepresented that the jersey had been authenticated and was in fact authentic when in reality it was not authentic and Sotheby's had acted with reckless indifference to the risk of inauthenticity. Before the Court is Defendants' motion for summary judgment.

### II.　　FACTUAL BACKGROUND

In 1998, Sotheby's agreed to auction a collection of baseball memorabilia owned by Barry Halper, a prominent collector (the "Halper Collection"). MSJ 292-303. Halper was reputed to be the single greatest collector of baseball memorabilia in the country at that time and had an enormous collection of approximately one million items, including one thousand baseball jerseys. MSJ 125, 192, 227. The collection included a jersey described as a 1951 Willie Mays

1

New York Giants Signed Rookie Road Jersey (the "Mays Jersey"), which Plaintiff purchased at the Sotheby's auction.  MSJ 246.

### A.  *Sotheby's Assembles a Team to Manage the Halper Auction*

Sotheby's engaged in extensive preparations for the Halper Auction.  Given the immense size of the collection, items were sold both at live auction as well as on the internet in collaboration with Amazon, and the auction itself took place over the course of nine days.  MSJ 125, 131, 275.  In order to prepare for an auction of this magnitude, Sotheby's collected a team of people to select the items for sale, sort them into groups, and vet the items.  In addition, the team worked to create a catalog for the live auction that contained descriptions and pictures of the items for sale as well as estimates of their value.  *See* MSJ 301.

This team consisted of several Sotheby's employees as well as a cadre of third-party "experts" in the field of sports memorabilia.  Sotheby's designated vice president Marsha Malinowski as the administrator for the Halper auction.  Malinowski, who had worked at Sotheby's for twelve years, had participated in other auctions, in some instances as the "expert in charge."  MSJ 253, 256-57.  She did not, however, have expertise in the subject of sports memorabilia and did not become familiar with the Halper collection at all as it was prepared for auction.  MSJ 257.

Indeed, as administrator of the Halper Auction, Malinowski was not involved in the day-to-day operations and did not participate in the process of identifying, sorting, or vetting the items for sale.  MSJ 130.  Rather, her role was to "over[see] the larger picture."  MSJ 136.  From Malinowski's perspective, her job was to "tak[e] care of Barry Halper," which involved "mak[ing] sure that he was happy with everything we were doing," "making sure he was happy with the product, the catalog, . . . learning about the process as far as exhibition, catalog, sale, the bid department."  MSJ 256-57.  She was also responsible for "making sure that all of the people

on the team who were responsible for putting the catalog together . . . completed [their tasks] by [the] deadline." MSJ 265. Once the auction got started, Malinowski's role, as she described it, "was to make sure that everybody was in place, whether it be the bid department, the auctioneer, the experts, to make sure that everything went fluidly and that the sale was a huge success." MSJ 262. Malinowski's compensation was not tied in any way to the financial success of the auction. MSJ 266.

Although Malinowski did not have any expertise in the sports memorabilia industry, Sotheby's also hired David Goodwillie, who did have prior experience in the business, "to work on the Halper Collection in the collectibles department." MSJ 257, 348. In addition, Sotheby's employee Laura Harden reported to Malinowski and oversaw all the experts and consultants that came to Sotheby's. MSJ 257. She was also responsible for maintaining the inventory of the property for sale, including keeping track of the items that were excluded because they could not be authenticated. MSJ 262.

At Halper's request[1] and on Malinowski's understanding that he had expertise in Halper's collection, Sotheby's hired Robert Lifson as the "senior consultant" or primary "expert in charge of the sale." MSJ 124, 127, 257, 258.[2] Lifson had been involved in auctioning sports collectibles since the 1970s and, around 1990, had opened an auction house called Robert Edward Auctions that specialized in the consignment and sale of sports memorabilia, with a "heavy emphasis on baseball collectibles." MSJ 114-15.

---

[1] Halper and Lifson had known each other for decades: Lifson letting Halper know if he saw an item that Halper might want to purchase, and Halper occasionally buying or consigning an item in one of Lifson's auctions. MSJ 117-18. Over the years, Lifson became familiar with the Halper collection and, when Halper decided to sell it, he asked Lifson if he would be willing to help. MSJ 117-19, 124.

[2] The record suggests that it was a common practice to hire an outside contractor as the "expert" for a sale. For example, Evans stated in his report that in 1991, Sotheby's handled a collection of baseball cards in a similar manner by hiring a third-party contractor as the expert for the auction. *See* MSJ 366. Lifson also testified that he was familiar with three other experts who he believes Sotheby's brought in as outside consultants for sports memorabilia auctions, Bill Mastro, Don Flanagan, and Dan Knoll. MSJ 123.

Although Sotheby's considered paying Lifson a percentage of the proceeds, he was uncomfortable with such an arrangement and asked Sotheby's to be paid a flat rate so that he would not have a financial stake in the sale of any particular item.  MSJ 126.  Sotheby's agreed to pay Lifson $500,000 for his services in connection with the action, an amount Lifson stated was "really much less" than other fees he had earned running auctions for his own business because the Halper auction "took [him] out of circulation for two years." MSJ 126-27, 304.

Lifson's primary task was to assemble the catalog that advertised the items available to prospective bidders.  MSJ 130, 258.  He "organiz[ed] the items into groups" to determine which items would appear in the catalog versus the online auction, and also provided estimates of each item's worth. MSJ 130-31, 135.  Such decisions required significant knowledge of and familiarity with the items at issue and their worth.  *Id*.  Lifson was also responsible for hiring specialists to vet different categories of material, *e.g*., bats, balls, jerseys.  MSJ 260.

      B.    *Lifson Hires Grey Flannel*

Most relevant here, at Lifson's suggestion, Sotheby's hired Grey Flannel Collectibles, Inc. ("Grey Flannel") to catalog the jerseys.  MSJ 79.  Malinowski did not participate in the selection process for hiring Grey Flannel and instead relied upon Lifson's decision.  MSJ 261 ("It was not a decision that was for me to make.  It was completely Rob Lifson's decision.").  According to Malinowski, it was not her responsibility to vet Lifson's choices.  She "relied on Rob Lifson for the choices that he made, and so did Sotheby's the company" because Lifson "was hired to be able to [make those decisions]." *Id*.  Thus, Malinowski did not undertake any due diligence with regard to the company before accepting Lifson's decision.  *Id*.  Nor did she undertake any due diligence to determine the method by which Grey Flannel would evaluate the baseball jerseys. MSJ 263.

Sotheby's entered into an agreement with Grey Flannel on December 22, 1998, pursuant to which Grey Flannel was to receive a flat fee of $50,000 for "cataloguing and condition reports on 1000 or fewer uniforms for the Halper collection." MSJ 60-61. The contract itself did not specifically include the word "authenticate." However, Richard Russek, owner of Grey Flannel, testified that "if you consider that we rejected jerseys I guess we authenticated jerseys too to the best of our knowledge." MSJ 186. To Russek, such an authentication meant that Grey Flannel was "rendering an opinion [that] the jersey had the right specs to be worn by the player in that specific year." MSJ 187. Moreover, Malinowski and Lifson testified that they understood that Sotheby's had hired Grey Flannel to: (a) analyze all the jerseys and uniforms in the Barry Halper collection; (b) only include jerseys that were deemed authentic in the auction catalog; and (c) to ensure that the jerseys were cataloged properly and were as described. MSJ 133, 208, 261.

### C. *Grey Flannel's Process*

In accordance with the contract, Sotheby's shipped jerseys from its warehouse to Grey Flannel's offices, in groups of approximately fifty to seventy-five. MSJ 185-87. It gave no instructions to Grey Flannel as to how to proceed. MSJ 203. Rather, Grey Flannel determined for itself the "process that it would take to reach the conclusion as to whether to accept or reject a jersey." MSJ 198. It compared the jerseys in the Halper Collection with photographs of game-used jerseys and other available "exemplar" jerseys that were known to be authentic. MSJ 187. It also referenced a baseball uniform guide book written by Mark Okkonen, which listed the uniform styles each team had worn every year since 1908. *Id*. In addition, Grey Flannel used the technique of "actually hold[ing] the jersey up to the sunlight [to] try to see if [it could] discern any number change or font change" such as removal of stitching or other alteration. MSJ 188. If Grey Flannel needed additional help, it consulted with and sent Mr. Okkonen and, sometimes, James Gates at the Baseball Hall of Fame, photographs of the jerseys in question for

their opinion. MSJ 202-03. Gates compared the photos he received with others in the Hall of Fame's collection and reported back as to whether or not there appeared to be a match. MSJ 187, 202.

Using the above process, Grey Flannel removed approximately one hundred jerseys that it could not confirm as authentic. MSJ 137. These jerseys were excluded from the Sotheby's auction. *Id*. Russek testified that Grey Flannel did not approve any jerseys for inclusion in the auction that it did not believe to be authentic. MSJ 186, 203.

### D. *The Catalog*

Sotheby's published a three-part auction catalog titled The Barry Halper Collection of Baseball Memorabilia (the "Catalog"), which included an "Acknowledgement" statement that provided in relevant part:

> Grey Flannel Collectibles, Inc. is honored to have had the opportunity to evaluate and authenticate this wonderful collection of uniforms and jerseys belonging to Barry Halper. We would like to recognize and thank James Gates at the Baseball Hall of Fame Library and Mark Okkonen for their time and effort assisting in our research as it proved to be invaluable.

MSJ 37, 258. The Catalog also stated that "Grey Flannel has authenticated all uniforms and apparel (excluding most baseball hats)." MSJ 20.

Plaintiff received a copy of the Catalog in the summer of 1999. The Mays Jersey was described as "one of the most important pieces of memorabilia relating to his glorious career" and was listed as having an estimated value of $25,000-35,000. MSJ 22.

### E. *Jacobs' Purchase and Attempted Resale of the Mays Jersey*

Plaintiff placed the winning bid on the Mays Jersey on September 29, 1999 for $63,000. MSJ 6.[3] In July 2012, thirteen years later, Plaintiff retained non-party Lelands.com ("Lelands")

---

[3] Plaintiff also purchased a Willie Mays Travel Bag for $8,625 at the auction. Although Plaintiff's Amended Complaint alleges that Sotheby's is liable for fraud with respect to the Travel Bag as well as the Mays Jersey,

(formerly Leland's Collectibles") to appraise the Mays Jersey for insurance purposes. MSJ 7. Lelands, a competitor of Grey Flannel, was established in 1985 by partners Joshua Evans and Mike Heffner. MSJ 330. In 1999, Lelands also made its own bids at the Halper Auction and purchased several different items of sports memorabilia from Sotheby's. MSJ 332. Lelands inspected each of these items, determined that they were authentic, and resold them to various buyers. *Id*. In July 2012, Heffner, acting on behalf of Lelands, performed an appraisal and authentication of the Mays Jersey for Plaintiff and concluded that the jersey was authentic. MSJ 369. Heffner appraised the Mays Jersey at a value of $400,000. *Id*.

On or about June 11, 2013, Evans prepared a handwritten agreement on behalf of Lelands to Plaintiff in which Lelands agreed to purchase the Mays Jersey from Plaintiff for $675,000 in order to resell the jersey to a third-party client of Lelands for $750,000. MSJ 371. Because the offer price was significantly higher than the original purchase price in 1999, Lelands sent the jersey to Dave Grob at an authentication company called MEARS for additional authentication. MSJ 337-38. Grob examined the Mays Jersey using online research and film references created after 1999 and concluded that the Mays Jersey was inauthentic. MSJ 7, 391. Lelands thereafter rescinded its sales agreement with Plaintiff. MSJ 7.

### III.   SUMMARY JUDGMENT STANDARD

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (citations and internal quotation marks omitted). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

---

counsel for Plaintiff conceded at oral argument that he cannot meet his burden with respect to the travel bag, and that his argument is focused solely on the Mays Jersey. June 16, 2016 Hr. Tr. at 59.

7

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "The reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).

**IV.     DISCUSSION**

The parties agree that Plaintiff's fraud claim is governed by New York law and that, accordingly, he must show a representation of material fact, falsity, scienter, reliance, and injury. *Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892 (N.Y. 1999). As Plaintiff notes, "a claim for fraud typically arises from a misrepresentation or omission of fact that is *intentional* so as to deceive another to rely upon that fact to his detriment." Opp'n at 29 (citing *Schlaifer Nance & Co. v. Estate of Warehol*, 119 F.3d 91 (2d Cir. 1997) (emphasis added). Under New York law, however, the element of scienter can be established either by showing intentional misconduct or a "reckless indifference to error." *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 46 (2d Cir. 1978). The Second Circuit has defined recklessness as "a state of mind approximating actual intent," which can be established by conduct that is "highly unreasonable," representing "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184-85 (2d Cir. 2014) (internal quotation marks omitted)). "Mere deviations from standards of ordinary care" are insufficient. *In re Livent, Inc. Noteholders Securities Litig.*, 151 F. Supp. 2d 371, 422 (S.D.N.Y 2001).

Here, Plaintiff does not argue that Sotheby's consciously intended to deceive its customers: Rather, it argues that: (1) the method by which the jerseys in Halper's collection

8

were authenticated was flawed; and (2) by allowing Lifson to control the authentication process with no oversight, Sotheby's acted with reckless indifference to the risk that the jerseys in the Halper Auction would be held out as authentic when they were not.

To show recklessness, Plaintiff relies upon expert testimony by Joshua Evans, Chairman and Founder of Lelands. MSJ 381. In a separate motion, Defendants seek to exclude Evans' testimony, and at oral argument counsel for all parties argued at length concerning whether his testimony is reliable under the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Because, as discussed below, Plaintiff has failed to raise a genuine issue of material fact that Sotheby's acted with the requisite scienter under New York law even taking Evans testimony into account, the Court need not separately analyze whether Evans testimony satisfies *Daubert*. Thus, for purposes of this motion, the Court assumes without deciding that Evans' testimony is admissible and will consider his report and deposition testimony as part of the record.

On March 8, 2016, Plaintiff proffered a report by Evans in which he concludes that, based on his expertise in the industry and upon review of Lifson, Russek, and Malinowski's deposition transcripts, Sotheby's was "reckless" in its authentication of the baseball jerseys for the Halper Collection. MSJ 365-68, 381. Evans reaches this conclusion based on the following factors: (1) Sotheby's was aware of "the authenticity problems in the sports memorabilia industry," MSJ 381-82; (2) there was a conflict of interest in hiring Lifson given that Halper requested that he be hired and Sotheby's paid him $500,000, MSJ 382; (3) Sotheby's only used one entity – Grey Flannel – to vet the jerseys, and its "failure to require independent, competent authentication" was "'the' major problem" for the sale, *id.*; (3) Grey Flannel conducted only a "soft authentication" rather than a rigorous one, as evidenced by the fact that they were only paid

9

approximately fifty dollars per jersey, *id.*, MSJ 334; and, (4) Grey Flannel had a conflict of interest given that one of the Grey Flannel partners had sold Halper "many of the pieces in his collection through the years, which were included in the Sotheby's auction." MSJ 383. According to Evans, Sotheby's "should have relied upon 'second opinions' from independent, knowledgeable authenticators of baseball jerseys" and "should not have relied on Grey Flannel alone to make authentication decisions." MSJ 383-84.

Even assuming Evan's testimony is admissible under *Daubert* and interpreting the evidence in the light most favorable to Plaintiff, the Court finds that no reasonable jury could determine that the process used to vet the jerseys was an "extreme departure" from the standards of ordinary care applicable to the authentication of sports memorabilia in 1999. The most Plaintiff can establish through Evans' testimony is that Grey Flannel did not perform a top-notch authentication and Lifson chose them either out of carelessness or because he was motivated to let inauthentic items into the sale given his ties to Halper. Even if true, such facts would only be sufficient to show that *Grey Flannel* or *Lifson* acted with the requisite scienter for fraud. To hold *Sotheby's* liable for fraud, Plaintiff must point to evidence from which a factfinder could reasonably infer that Sotheby's displayed an extreme departure from the standards of ordinary care applicable to auction houses in selecting and relying upon third-party authenticators for sports memorabilia. The only evidence Plaintiff identifies that could potentially support such a conclusion consists of: (1) Sotheby's decision to place Malinowski in charge of the Halper Auction when she had no prior experience in the sports collectibles industry, sports memorabilia auctions, or sports memorabilia authentication; (2) Malinowski's reliance upon Lifson to select whatever vetting services were necessary for the auction without conducting her own independent due diligence; and (3) Malinowski's knowledge that Lifson and Russek had a

longstanding friendship with Halper, which presented a potential conflict of interest. Opp'n at 31. Plaintiff argues that these facts are sufficient to infer recklessness because "it was incumbent upon Sotheby's to ensure that the authenticator would be independent to safeguard Sotheby's reputation and the reliance on that reputation by the bidding public, including Jacobs." *Id.*

As a preliminary matter, and as Plaintiff readily acknowledges, "[t]here has never been an authoritative body which promulgates standards which govern the purchase, sale and authentication of sports collectibles." Opp'n at 8 (citing MSJ 333). Such standards "do not exist and have never existed." *Id*. at 8. Furthermore, as Evans himself notes, there are no applicable standards relating to conflicts of interest and quality control in the context of a large-scale sports memorabilia auction. *See* MSJ 383. Moreover, even assuming that Evans can testify as an "expert in the field of sports memorabilia," MSJ 381, nothing in Evans' expert report identifies the standard of care Sotheby's was required to follow in selecting a third-party expert to authenticate the jerseys. While Evans offers various criticisms of the process Sotheby's and Grey Flannel employed, these observations do not identify a standard from which to evaluate Sotheby's actions.

A closer examination of Evans' observations highlights the impossibility of concluding that Sotheby's conduct was an extreme departure from the standards of ordinary care. Turning first to Evans' opinion that Sotheby's was reckless in placing Malinowski in charge of the auction, Evans does not state that the applicable standard of care required an auction administrator to have personal knowledge and expertise concerning the contents of the sale or the applicable industry generally. There is no evidence, for example, that could identify for the factfinder what the industry expectations were with respect to an auction administrator or whether Sotheby's internal guidelines for selecting administrators lived up to industry norms.

11

Nor is there any record evidence that would elucidate how and why Malinowski was chosen for the role, or who was responsible for placing her in that position. All the record evidence shows is that it was common practice at Sotheby's to hire an outside consultant to act as the expert for an auction, and that it was not the administrator's role. Indeed, Malinowski testified that it was not her responsibility to oversee the authentication of the items for sale, or to even become familiar with them. Rather, her role was primarily to ensure that the work to prepare for the auction progressed smoothly, that Halper was comfortable with the process, and that the auction itself was a success. Malinowski further testified that the reason she was not involved in the selection of vendors to vet the collection was that those tasks were delegated to Rob Lifson, and that he was hired specifically for that purpose. Malinowski explained that she hired Lifson because Halper believed he was best suited for the job given his expertise in the sports memorabilia industry and his familiarity with Halper's extensive collection. Regardless of Lifson's individual qualifications, there is no record evidence that it was "highly unreasonable" as a general matter for Sotheby's to rely on the expertise of a third party expert. Accordingly, there is no evidence from which a factfinder could conclude that by assigning Malinowski as the administrator of the auction Sotheby's possessed a state of mind "approximating actual intent" to deceive its customers concerning the authenticity of the items for sale.

      With respect to Evans' conclusion that Sotheby's was reckless when it hired Lifson in particular, again, Plaintiff has provided no evidence that would identify the standards an auction house must follow when it hires an outside consultant to act as the expert in charge of the sale. In addition, Plaintiff has pointed to no evidence concerning the process by which Lifson was actually hired aside from the fact that Halper requested to bring him onto the team. There is no information identifying any individuals at Sotheby's who might have interviewed Lifson and

how they concluded he was qualified to run the auction. The record evidence does, however, provide a basis to conclude that Lifson was in fact qualified. In addition to Lifson's own testimony concerning his qualifications as a long-time member of the sports memorabilia collectibles industry, Evans concedes that Lifson "had the qualifications and expertise to make major decisions regarding the sale." MSJ 383. Evans' only argument in support of his conclusion that Sotheby's was unreasonable to hire Lifson is his personal opinion that Lifson was tainted by a conflict of interest given his connection to Halper. However, Plaintiff points to no evidence showing that a conflict of interest actually existed aside from the fact that Lifson was paid $500,000 for his work. MSJ 382. As set forth above, Lifson testified that the reason he requested a flat fee was precisely to *avoid* any conflict of interest so that his compensation would not be tied in any way to the number of items that went for sale or the prices he suggested for them. MSJ 126. Moreover, Lifson explained that the $500,000 he received for his work was reasonable in light of the fact that he spent two years preparing for the auction and did not have time to conduct any of his own business, which would have generated greater income. MSJ 127. Plaintiff has pointed to no evidence from which a fact-finder could conclude that these conditions represent an extreme departure from the relevant standard of care in the event that an auction house hired an expert to manage the auction items.

     Finally, even assuming that Lifson had a potential conflict of interest, the record reflects that at least two Sotheby's employees who were assigned to the Halper sale were aware that Grey Flannel had in fact excluded numerous jerseys from the auction as a result of its work. Thus, by the time Sotheby's made its representations concerning authentication and authenticity in the Halper Catalog, at least those employees would have had a basis to believe – by negative

implication – that the statements about the authenticity of those jerseys that had not been excluded by Grey Flannel were accurate.

At best, Plaintiff has adduced evidence from which a fact-finder could conclude that the process by which the Mays' Jersey was ultimately included in the Halper Auction was flawed and that Sotheby's could have done more at various junctures to ensure that the experts it hired, and the processes those experts employed, were unimpeachable.  Sotheby's could have put an employee with expertise in sports memorabilia in charge as administrator; it could have paid more for the authentication work; it could have hired authenticators with no stake whatsoever in any item for sale at the auction; it could have hired multiple authenticators; and it could have made sure to vet Lifson's decisions for authentication rather than rely upon his expertise.  For purposes of Plaintiff's fraud claim, however, what Sotheby's *could have done* or what Evans might have done instead had he been in charge are irrelevant.  The only relevant inquiry here is whether Sotheby's acted with a mental state "approximating actual intent" to deceive when it represented that the items in the Halper sale were authenticated and authentic.  Because Plaintiff has failed to point to evidence that would allow a factfinder to reasonably arrive at such a conclusion, the motion for summary judgment is granted.

An appropriate order follows.

                **/S/WENDY BEETLESTONE, J.**

**July 25, 2016**            _____
                 **WENDY BEETLESTONE, J.**